**SECOND INJURY FUND OF IOWA, Appellant,**

v.

**Larry P. SHANK, Appellee.**

**No. 93–158.**

Supreme Court of Iowa.

May 25, 1994.

Bonnie J. Campbell, Atty. Gen., and Shirley A. Steffe, Asst. Atty. Gen., for appellant.

Channing L. Dutton of Lawyer, Lawyer, Dutton & Drake, West Des Moines, for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

In this procedurally complicated judicial review proceeding, the Second Injury Fund (Fund) appeals from a district court ruling upholding two decisions of the Iowa Industrial Commissioner. The commissioner awarded Fund benefits to claimant Larry P. Shank. In upholding the commissioner's decisions, the district court rejected the Fund's contentions on five issues. In rejecting these contentions, the court upheld the commissioner's rulings that (1) Shank sustained a prior loss of his left foot, (2) Shank was permanently and totally disabled, (3) considered Shank's visual impairment as a prior loss even though no such claim had been pled or urged by Shank, (4) Shank's visual impairment constituted a prior loss, and (5) Shank's visual impairment constituted a sixty percent impairment of the whole person. In its appeal here, the Fund contends the district court erred in upholding the commissioner's decisions on these five issues. We affirm.

I. *Background Facts.*

Shank was born on April 28, 1947. He suffers from congenital cataracts in both eyes. A graduate of the Iowa Braille and Sightsaving School in Vinton, Shank was employed for about nineteen years by Mercy Hospital Medical Center (Mercy) in Des Moines. His job—first as an orderly and later as a nursing assistant—included much lifting and walking. His work required him to be on his feet about ninety-eight percent of the time.

About August 1979 Shank began having problems with his left foot. Pain developed in his left heel, then generalized to his entire foot. An original diagnosis of a bone spur was later modified to include tarsal tunnel syndrome. Shank saw Dr. J.D. Bell, a Des Moines orthopedic surgeon, for his problem. Dr. Bell performed corrective surgery in November 1979, in which Shank's left tarsal tunnel was enlarged. This procedure was intended to relieve Shank from pinched nerves in his left foot and allow more blood to flow to his toes.

Following his operation, Shank could not return to work until March 1980. Dr. Bell issued two permanent work restrictions. These were that Shank (1) have time off his feet and (2) be able to rest during the work day.

Mercy apparently did not accommodate Shank's work restrictions. Dr. Bell renewed

the restrictions several months after Shank's return to Mercy. At this point Shank began investigating other employment opportunities at the hospital. He told the personnel director that if any jobs he could handle came open, he would like the "first shot" at them.

In November 1982—about three years after his left foot problem—Shank began exhibiting tarsal tunnel symptoms in his right foot and ankle. In January 1983 Dr. Bell performed corrective surgery on this foot. As a result of the surgery, Shank was off work recuperating for an extended period of time. This time Shank experienced severe post-operative pain but successfully completed a pain management program at Mercy.

Dr. Bell finally released Shank for work in September 1984. His first day back at work went fairly well. But that evening numbness and tingling returned to his right foot. Work the second day worsened his condition. On the third day Shank finished his shift, although by now he was in tremendous pain. The hospital doctor then took Shank off work, and Shank returned to Dr. Bell for further treatment. Shank applied and interviewed for several different positions at Mercy. He was not hired for any of them. Shank has not returned to work since then.

## II. *Background Proceedings.*

Shank filed a petition in arbitration with the commissioner. In it, he sought benefits from Mercy and its insurance carrier, Aetna Casualty and Surety Co. (Aetna), for the injury to his right foot and leg in November 1982. Shank also sought benefits from the Fund based on the August 1979 left foot injury and the November 1982 right foot and leg injury.

A deputy commissioner found that the August 1979 injury to Shank's left foot did not produce any permanent partial disability. The deputy then went on to hold on his own that Shank's congenital cataract condition constituted a prior loss under Iowa Code section 85.64 (1979). The deputy also found that (1) Shank's November 1982 injury resulted in a ten percent permanent partial impairment of his right leg and (2) Shank was permanently and totally disabled. The deputy awarded Shank benefits from the

Fund beginning January 12, 1991, for as long as he remained permanently and totally disabled.

The Fund appealed to the commissioner. Shank, Mercy, and Aetna cross-appealed. Contrary to the deputy's finding, the commissioner found that Shank "had a prior loss of three percent permanent functional impairment of his left foot." The commissioner also found that (1) Shank's "employment at Mercy produced injury to his right leg and has left him with a ten percent permanent functional impairment of the right leg," (2) the right leg injury has left Shank "unable to engage in employment which requires extended standing or otherwise being on his feet," and (3) Shank's "vision loss makes him incapable of obtaining employment requiring the use of his eyes."

In his conclusions of law the commissioner stated that (1) Shank's "left foot condition constitutes a prior loss within the meaning of section 85.64," (2) the injury to Shank's "right foot and leg, which arose out of and in the course of his employment at Mercy, produced a permanent loss of use of that leg within the meaning of section 85.64," (3) Shank "is permanently and totally disabled within the meaning of section 85.34(3)," and (4) "the record is inadequate to determine the extent of disability caused by [Shank's] vision loss." The commissioner remanded the case to the deputy for the limited purpose of determining the extent of Shank's present disability caused by his congenital vision loss.

The Fund petitioned the district court for judicial review. Finding that all administrative remedies had not been exhausted, the district court remanded the case to the commissioner for "further proceedings pursuant to the Industrial Commissioner's order in this case."

After neither party produced additional evidence on remand, the deputy proceeded to determine the extent of Shank's disability caused by his congenital vision loss. In his words, he did so "subjectively." The deputy found that Shank had an eighty-five percent loss of use of both eyes because of the cataract condition which existed at and before

the injury to his right foot and leg. The deputy translated this eighty-five percent loss of use into an eighty percent loss of use of the whole person. The deputy ordered the Fund to start benefit payments on April 30, 1994, which was 404.5 weeks after July 29, 1985. The July 29, 1985, date was chosen because that marks the end of Mercy's payment of permanent partial disability for Shank's right leg impairment.

The Fund and Shank both appealed to the commissioner. The commissioner affirmed and modified the deputy's conclusions, ordering payment of benefits to begin 304.5 weeks after July 29, 1985.

The Fund and Shank petitioned for judicial review with the district court. Their petitions were consolidated. Following a hearing and Shank's subsequent motion for reconsideration, the district court affirmed both of the commissioner's appeal decisions.

It is from this order that the Fund appeals. Neither Mercy nor Aetna have appealed.

### III. *Scope of Review.*

■ We review the commissioner's decisions under Iowa Code chapter 17A. *See* Iowa Code § 86.26. Our review of administrative agency decisions—like that of the district court—is limited to correcting legal error. *Mortimer v. Fruehauf Corp.,* 502 N.W.2d 12, 14 (Iowa 1993). The findings of the commissioner are akin to a jury verdict, and we broadly apply them to uphold the commissioner's decision. *Second Injury Fund v. Hodgins,* 461 N.W.2d 454, 455 (Iowa 1990). We must decide whether the commissioner's conclusions are supported by substantial evidence in the record made before the agency when the record is viewed as a whole. Iowa Code § 17A.19(8)(f). Evidence is substantial if a reasonable mind would find it adequate to reach a conclusion. *Suluki v. Employment Appeal Bd.,* 503 N.W.2d 402, 404 (Iowa 1993). An agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence. *John Deere Dubuque Works v. Weyant,* 442 N.W.2d 101, 105 (Iowa 1989). In such a case we cannot interfere with the commissioner's findings of fact. *Schrecken-*

*gast v. Hammermills, Inc.,* 369 N.W.2d 809, 811 (Iowa 1985).

### IV. *Applicable Law.*

■ The Fund is statutorily created. *See generally* Iowa Code §§ 85.63 through 85.69 (Second Injury Compensation Act). The purpose of the Fund is to encourage employers to hire the disabled by making the current employer responsible only for the disability the current employer causes. *See Anderson v. Second Injury Fund,* 262 N.W.2d 789, 791–92 (Iowa 1978).

The pertinent section here—Iowa Code section 85.64—provides in part:

> If an employee who has previously lost, or lost the use of, one hand, one arm, one foot, one leg, or one eye, becomes permanently disabled by a compensable injury which has resulted in the loss of or loss of use of another such member or organ, the employer shall be liable only for the degree of disability which would have resulted from the latter injury if there had been no pre-existing disability. In addition to such compensation, and after the expiration of the full period provided by law for the payments thereof by the employer, the employee shall be paid out of the "Second Injury Fund" created by this division the remainder of such compensation as would be payable for the degree of permanent disability involved after first deducting from such remainder the compensable value of the previously lost member or organ.

Pursuant to this section, the Fund is responsible for the difference between the disability caused by the current employer and the total amount of disability.

■■ To trigger the application of section 85.64, the employee must establish that (1) the employee has either lost, or lost the use of a hand, arm, foot, leg, or eye; (2) the employee sustained the loss, or loss of use of another such member or organ through a work related—that is, compensable—injury; and (3) there must be some permanent disability from the injuries. *Anderson,* 262 N.W.2d at 790. The prior loss or loss of use need not be work related. *Second Injury Fund v. Neelans,* 436 N.W.2d 355, 357 (Iowa

1989). Nor does the prior loss or loss of use have to be a total loss or loss of use. *Second Injury Fund v. Braden*, 459 N.W.2d 467, 469 (Iowa 1990).

■ For purposes of workers' compensation law, there are two ways to evaluate a disability: functional and industrial. Functional disability is arrived at by determining the impairment of the employee's body function and is limited to the loss of the physiological capacity of the body or body part. *Mortimer*, 502 N.W.2d at 14.

■ Industrial disability goes beyond body impairment and measures the extent to which the injury impairs the employee's earning capacity. Functional disability is, however, one factor in the determination of industrial disability. Other factors included in the determination of industrial disability are the employee's age, education, qualifications, experience, and the ability of the employee to engage in employment for which the employee is fitted. *Id.* at 14–15.

Chapter 85 divides permanent partial disability into a scheduled and unscheduled loss. *See* Iowa Code § 85.34(2). Paragraphs (a) through (t) of section 85.34(2) are reserved for scheduled injuries. Specific weekly benefits are listed. For example, paragraph (n) covers the loss of a foot and provides in that case for weekly compensation during one hundred fifty weeks. *See* Iowa Code § 85.-34(2)(n).

Unscheduled injuries are covered in paragraph (u), and benefits for these injuries are based on the injury to the body as a whole. *See* Iowa Code § 85.34(2)(u) ("Compensation shall be paid during the number of weeks in relation to five hundred weeks as the disability bears to the body of the injured employee as a whole.").

Iowa Code section 85.34(3) covers compensation for an injury causing permanent total disability.

■ Functional disability is used to determine a specific scheduled disability; industrial disability is used to determine an unscheduled disability. *Mortimer*, 502 N.W.2d at 15. So, as we said in *Mortimer*,

a person may suffer a permanent total disability as a result of some scheduled injury. This may happen because of age, lack of training, or other condition peculiar to the person. Yet such an injury is arbitrarily compensable according to the schedule.

*Id.*

■ An unscheduled injury can result in permanent total disability. In these circumstances, the "weekly compensation is payable during the period of the employee's disability." *Id.* (citation omitted).

In *Braden*, as here, both the prior loss and the current loss were scheduled injuries. In determining the Fund's liability, we held that "[i]t is the *cumulative* effect of the scheduled injuries resulting in industrial disability to the body as a whole—rather than the injuries considered in isolation—that triggers the Fund's proportional liability." *Braden*, 459 N.W.2d at 470. In *Braden*, the commissioner found that the employee's two scheduled injuries together resulted in industrial disability of sixty percent. The commissioner assessed liability against the Fund for the employee's unscheduled loss (300 weeks), less the employer's liability for the scheduled losses (eighty-eight weeks). This resulted in a liability to the Fund of 212 weeks. We determined this computation followed the requirements of section 85.64.

In *Braden*, we made it clear that if the second scheduled injury, standing alone, does not amount to a disability of the body as a whole, the liability of the employer under section 85.64 is limited to the payment of the scheduled amount attributed to the second injury. *Braden*, 459 N.W.2d at 471. Simply put, when "both injuries are scheduled, that is, neither is itself an injury to the body as a whole, the Fund is liable for the entire amount of the industrial disability minus the two scheduled amounts." *Id.*

### V. *The Issues.*

■ A. *Whether there was substantial evidence that the left foot injury constituted a prior loss under Iowa Code section 85.64.* As we noted earlier, an employee may recover from the Fund if three threshold condi-

tions are met. First, there must be a loss or loss of use of a scheduled member (here, the left foot). Second, there must be a loss or loss of use of another member (here, the right foot and leg) as a result of a compensable injury. Last, there must be some degree of permanent disability from both the first and second loss or loss of use.

The Fund does not dispute that Shank met the first two requirements. The Fund contends, however, that there was not substantial evidence on the third requirement: There must be some degree of permanent disability from both the first and second loss or loss of use. The Fund argues that the injury to Shank's left foot did not produce any permanent disability. The deputy found there was no such disability. But the commissioner decided otherwise and found that Shank had a prior loss of three percent permanent functional impairment of his left foot. The commissioner concluded that the left foot condition constituted a prior loss within the meaning of section 85.64. The district court affirmed the commissioner's decision on this issue, concluding there was substantial evidence to support it. For reasons that follow, we think properly so.

Shank was apparently evaluated for the benefit of Aetna by Dr. Robert F. Breedlove. In a letter to Aetna, Dr. Breedlove characterized Shank as "completely asymptomatic" in his left foot. The commissioner found that Dr. Breedlove

did rate [Shank's] left foot condition as having no impairment. *However, Dr. Breedlove also noted that [Shank] was still in the process of healing.*

Dr. Bell, Shank's treating physician, subsequently evaluated Shank's left foot condition and assigned the left foot a three percent permanent impairment:

As far as his left foot is concerned, I feel he has suffered approximately 3% permanent partial disability due to his previous tarsal tunnel syndrome and subsequent surgery.

There was apparently no later examination of Shank's left foot by any other medical expert contradicting Dr. Bell's assessment of Shank's disability.

As Shank points out, Mercy—in the original left foot injury case—treated the left foot injury as compensable and paid Shank compensation based on the three percent permanent impairment rating.

Consistent with his evaluation, Dr. Bell imposed work restrictions when Shank went back to work after surgery on the left foot. Because Mercy did not honor these restrictions, Dr. Bell renewed the restrictions. Those restrictions recommended against any long periods of standing and ambulating. Significantly, Dr. Bell advised Mercy that Shank "suffers from a chronic condition which is aggravated by long periods of standing and ambulating." Dr. Bell also suggested a different job position for Shank.

■ B. *Whether there was substantial evidence of permanent and total disability.* The commissioner concluded that Shank was permanently and totally disabled within the meaning of section 85.34(3) (fixing compensation for injury causing permanent total disability). The district court determined there was substantial evidence to support this conclusion.

The Fund complains this conclusion is wholly unsupported by the evidence. We disagree and conclude there is substantial evidence that Shank is permanently and totally disabled within the meaning of section 85.34(3).

After his right foot surgery, Shank was off work for about eighteen months. When he did return, Shank only lasted three days. The pain was so severe that the hospital doctor stopped Shank from further work. Shank could no longer endure the walking and long standing required by the job. Despite Shank's urging for other types of work at Mercy, the hospital was not able to place him in another job.

The Fund, however, points to the number of activities that Shank engaged in following his last day of employment at Mercy. The Fund thinks that Shank's ability to engage in these activities belies the commissioner's conclusion that Shank is unable to work in any occupation. These activities included (1) domestic chores, (2) caring for and showing his dogs, (3) kennel work, (4) completing a veter-

inary assistant correspondence course, (5) pet groomer (two days), (6) house sitter, (7) mowing his lawn, (8) riding a bicycle, and (9) exercising.

We think what we said in a recent case adequately answers the Fund's complaint:

Industrial disability means reduced earning capacity. Bodily impairment is merely one factor in gauging industrial disability. Other factors include the worker's age, intelligence, education, qualifications, experience, and the effect of the injury on the worker's ability to obtain suitable work. When the combination of factors precludes the worker from obtaining regular employment to earn a living, the worker with only a partial functional disability has a total industrial disability.

. . . .

The question is more than … what the evidence shows [the employee] "can or cannot do." The question is the extent to which the injury reduced [the employee's] earning capacity. This inquiry cannot be answered merely by exploring the limitations on his ability to perform physical activity associated with employment. It requires consideration of all of the factors that bear on his actual employability.

*Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 103, 104 (Iowa 1985) (citations omitted). Simply put, the question is this: Are there jobs in the community that the employee can do for which the employee can realistically compete? *Id.* at 104.

The commissioner made a detailed finding of fact on this total disability issue:

The Fund also urges that claimant is not permanently totally disabled. Claimant is unable to return to his position as a nursing assistant due to the condition of his right leg. Claimant has a rating of ten percent permanent impairment of the right lower extremity. Claimant cannot operate a motor vehicle or work in jobs requiring reading. Most sedentary jobs would require better vision than claimant has even with corrective lenses. Claimant is motivated to work and would rather be working. The employer failed to rehire claimant. Claimant's inability to drive makes him dependent on others for transportation to any job he might find.

Prior to the onset of claimant's right leg condition, claimant was able to maintain employment in spite of his congenital loss of vision by riding to work with his wife.

His work required him to be on his feet. His present leg condition prevents him from returning to that job or any job requiring him to stand or walk. Claimant does, however, apparently participate in dog shows, which require him to walk. It is noted, however, that claimant initially experienced pain in his left foot while participating in such a dog show.

Claimant's vision loss is severe. It eliminates many · job opportunities claimant would enjoy if he had normal or near-normal vision. By itself, claimant's vision loss did not foreclose his ability to maintain employment as a nursing assistant with the help of his wife. By itself, claimant's right leg condition might not prevent claimant from finding employment that did not require him to be on his feet. But claimant's eye and leg conditions do not exist in isolation, but rather exist concurrently. Claimant is foreclosed from any occupations that require him to stand or walk. Claimant is foreclosed from many "desk jobs" because he is unskilled and unable to see well enough to do bookwork, reading, or other tasks relying on sight. Claimant is also foreclosed from any occupations requiring an ability to operate a motor vehicle.

Claimant was born in 1947, and has a high school education. Based on these and all other appropriate factors for determining industrial disability, it is determined that claimant is permanently totally disabled.

The question we must resolve is not whether there is substantial evidence to support a conclusion the commissioner did not make. We must decide if there is substantial evidence for the conclusion he did make. *Honeywell v. Allen Drilling Co.*, 506 N.W.2d 434, 437 (Iowa 1993). We conclude there was.

■ *C. Whether the commissioner properly considered Shank's visual impairment*

*as a prior loss even though not pled nor urged by Shank; whether Shank's visual impairment constituted a prior loss; whether Shank's visual impairment constituted a sixty percent impairment of the whole person.* We consider these three issues together because they are related. It is undisputed that Shank did not plead nor urge that his visual impairment was a prior loss within the meaning of section 85.64. The Fund contends his failure to do so precluded the commissioner from considering the visual impairment as a prior loss. And, even if the issue was properly before the commissioner—the Fund continues—a congenital defect like Shank's visual impairment is not a prior loss within the meaning of section 85.64. Finally—the Fund concludes—the evidence does not support a finding that the visual impairment constituted a sixty percent impairment of the whole person.

We need not decide these issues because what the commissioner did was not prejudicial to the Fund. In fact, the commissioner's use of the visual impairment as a prior loss was beneficial to the Fund and prejudicial to Shank. Shank, however, has not appealed so he cannot now complain. The commissioner's discussion on the visual impairment supports our conclusion of no prejudice:

> Claimant urges on appeal that claimant's prior loss of his foot be utilized as the sole prior loss under section 85.64 in terms of determining the "credit" the second injury fund is entitled to. However, claimant had more than one loss prior to his second injury. Limiting the "credit" to only one of those prior losses would result in an unfair award against the second injury fund for one of those prior losses. In addition, claimant would be compensated for a prior loss that may not have been compensable, such as his congenital cataracts. The better application of the Second Injury Compensation Act is to treat both prior conditions, claimant's vision loss and his left foot impairment, as prior losses under section 85.64.

The sixty percent impairment of the whole person for the vision impairment translates into three hundred weeks under the provisions of Iowa Code section 85.34(2)(u) (500

weeks × 60%). The three percent permanent impairment for the left foot translates into 4.5 weeks under Iowa Code section 85.34(2)(n) (150 weeks × 3%). Adding the two together pursuant to section 85.64 results in a credit to the Fund of 304.5 weeks. In his order, the commissioner gave effect to this credit by delaying payments to Shank for 304.5 weeks after July 29, 1985.

The commissioner, however, was not entirely consistent with our approach in *Braden.* As *Braden* holds, the Fund was also entitled to a credit for the second scheduled injury. *Braden,* 459 N.W.2d at 471. The commissioner should have allowed the Fund a credit for the ten percent impairment to the right leg pursuant to Iowa Code sections 85.34(2)(*o*) and 85.64. The ten percent impairment translates into twenty-two weeks of compensation under Iowa Code Section 85.34(2)(*o*) (220 weeks × 10%). The Fund, however, did not raise this as an issue. So we give it no further consideration.

For all these reasons, we conclude the district court was correct in upholding the commissioner's decision on these three issues.

## VI. *Disposition.*

There was substantial evidence to support the commissioner's decision that Shank's left foot injury constituted a prior loss under Iowa Code section 85.64 and that Shank was permanently and totally disabled within the meaning of section 85.34(3). The commissioner's decision to treat Shank's visual impairment as a prior loss and assigning that impairment a sixty percent impairment of the whole person did not prejudice the Fund. So the district court correctly upheld the commissioner's decisions on all the issues the Fund raised. Accordingly, we affirm.

**AFFIRMED.**