**QUAKER OATS COMPANY, Appellant,**

v.

**Bradley CIHA, Appellee.**

**No. 95–314.**

Supreme Court of Iowa.

July 24, 1996.

James E. Shipman and Chad M. VonKampen of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, for appellant.

Robert R. Rush and Jana L. Happel of Lynch, Dallas, Smith & Harman, P.C., Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

Several issues are presented in this workers' compensation case: whether petitioner Bradley Ciha sustained an injury arising in the course of employment, whether certain expenses incurred by Ciha as a result of his injury are compensable under Iowa Code section 85.27, and whether Ciha sustained an eighty percent industrial disability. The industrial commissioner and district court found in favor of Ciha on all issues. Because we believe the commissioner's decision is supported by substantial evidence, we affirm.

I. *Background facts.* In May 1991, petitioner Bradley Ciha was employed by defendant Quaker Oats Company at its Cedar Rapids plant as an area maintenance supervisor. Quaker Oats employed twenty to twenty-five such supervisors. In that position, he was responsible for the planning, scheduling, and supervising of plant maintenance in a designated area of the plant's operation. By all accounts, Ciha was considered an excellent employee. Ciha's normal work week at Quaker Oats was Monday through Friday. On a typical weekend including Saturday and Sunday, Ciha was not on duty and was not expected to be on call to drive to the plant for emergency maintenance purposes.

For the first forty-eight hours on Memorial Day weekend in 1991, Ciha was assigned as "204 supervisor" for Quaker Oats.[1] In

---

1. As an area maintenance supervisor for Quaker Oats, Ciha's duties included occasional weekend duty as the "204 supervisor" (also referred to as a "breakdown" or "duty" supervisor). A maintenance supervisor acting as the 204 supervisor must be on call to handle mechanical breakdowns in any part of the Quaker Oats plant. He or she is essentially a dispatcher, who is responsible for evaluating any problems that may arise on the weekend. If the 204 supervisor so de-

that capacity, he was required to be on call for mechanical emergencies anywhere in the plant. On that particular Memorial Day weekend, Quaker Oats engaged in periodic heat sterilization of the plant for pest control purposes.

While preparing dinner at his home on Sunday, May 26, Ciha was contacted at approximately 4:15 p.m. through a company electronic paging device.[2] He was informed that several large cooling fans at the plant were malfunctioning. Ciha responded to the breakdown by electing to drive his motorcycle to the plant to remedy the problem himself. To reach the plant, Ciha drove a direct route (of approximately four and a half miles) on Johnson Avenue. After reaching the plant without incident, he personally remedied the problem by cooling the fans with an air hose. At approximately 5:45 p.m., Ciha telephoned his wife and informed her that she could resume dinner preparations because he was about to return home.

Ciha drove a different route from the plant to home than he drove earlier from his home to the plant. The return-home route was on Ellis road and was admittedly not the most direct route from the plant to Ciha's home. The Ellis road route (approximately nine miles) was scenic and subject to less traffic and traffic signals than the direct route Ciha commonly drove from home to the plant. Apparently, the Ellis road route took approximately five to seven minutes longer to drive than the direct, Johnson road route. Ciha chose to drive this route home only during the spring, summer, and fall seasons as the road could become treacherous during the winter months.

On his return trip from the plant to home along Ellis road, Ciha was involved in a serious motor vehicle accident in which he suffered a broken neck and was rendered a quadriplegic. At the time of the accident, Ciha was married and resided in a home in Cedar Rapids with his wife, Kim.

Following the accident, Ciha was admitted to St. Luke's Hospital in Cedar Rapids until June 12, 1991, when he requested transfer to a specialized care facility, Craig Hospital, located in Englewood, Colorado. Kim accompanied Ciha to Colorado and she remained with him for the duration of his stay.

In addition to the health care Ciha received while at Craig, the hospital also provided Kim specialized training in order for her to be able to care for Ciha upon his return home. Kim received specialized training in areas including suprapubic catheterization, bowel care, skin care, and recognizing potentially dangerous or life threatening conditions that may confront Ciha as a quadriplegic.

Ciha was discharged from Craig Hospital on September 14, 1991, to his home in Cedar Rapids.[3] Since his discharge, Kim has performed necessary, extensive home nursing services. Ciha requires assistance in dressing, changing urine bags, and transferring between his wheelchair and his bed. At night, he must be repositioned in bed one to four times in order to prevent him from developing pressure sores. Also, Kim must perform digital stimulation of Ciha for ap-

---

sires, he has the discretion to go to the plant to personally remedy the problem or arrange for the problem to be remedied.

Twenty to twenty-five area maintenance supervisors rotate the 204 duty and, in a given year, a supervisor may perform 204 duty on four to five weekends. The 204 supervisor may be responsible for spending part of a given weekend actually in the plant and, while away from the plant, the supervisor must be readily accessible by telephone. The 204 supervisor may carry an electronic paging device for convenience. While on 204 duty, the supervisor must remain physically close enough to the plant and have access to a motor vehicle so as to respond immediately to emergencies, if needed. A 204 supervisor is paid eight hours of straight time for the weekend duty and also may be paid overtime wages if more than four hours are worked in response to any emergency. Maintenance supervisors receive a higher salary than production supervisors due to the 204 weekend responsibilities that uniquely accompany the maintenance supervisor position.

2. During his six months as a maintenance supervisor prior to the Memorial Day weekend at issue, Ciha had twice before been assigned 204 duty but had never been contacted to remedy a problem.

3. Prior to Ciha's discharge from Craig Hospital, he and his wife arranged for $20,788 in home modifications through several contractors in order for Ciha's home to be accessible to him after the accident.

proximately ninety minutes every other day to induce bowel movements.

Ciha first returned to work at Quaker Oats in January 1992 in a new position as materials supervisor. In this position, he works at a computer (with the aid of an adaptive device and telephone headset) in the company's purchasing department. With the aid of a modified computer, Ciha analyzes inventory and makes purchases on behalf of Quaker Oats. Quaker Oats greatly aided in Ciha's return to work by adapting the workplace and position in order for Ciha to be able to perform the job.[4] It is apparent Ciha has progressed well in the new position.

In his position as materials supervisor, he receives the same base salary, not including raises, as that of an area maintenance supervisor. Ciha no longer has the same opportunity, however, to earn overtime as he had as an area maintenance supervisor. As an example of this, Ciha no longer can receive weekend pay and overtime as a 204 supervisor.

In order to return to work, Ciha relied on the county's disabled persons transportation service to and from Quaker Oats. Based on the hours of the transportation service, however, Ciha was not able to return to work full-time.

Ciha was readmitted to Craig for one week in March 1992 for a comprehensive evaluation. At the time of his readmittance, Ciha did not own a van and did not drive. While at Craig, Ciha had his driving potential assessed. A driving specialist from the hospital concluded Ciha would need to purchase a specially modified van in order to be able to drive independently. At some time thereafter, Ciha purchased the recommended van.

Many of Ciha's medical expenses from the accident were paid for through a group health and accident insurance plan available to Ciha through his employer Quaker Oats. However, there were significant limitations in coverage under the group plan. For example, in addition to a lifetime cap on medical expenses, the group plan did not provide Ciha coverage for necessary home health care services, home modifications, or motor vehicle conversions.

II. *Workers' compensation litigation.* In November 1991, Ciha filed a claim for permanent partial disability benefits, *see* Iowa Code § 85.34(2)(u) (1991), with the Iowa industrial commissioner's office against his employer, Quaker Oats, alleging a personal injury to the body as a whole (including head, arms, back, and legs).[5] In his petition for arbitration, Ciha also claimed he had incurred expenses under Iowa Code section 85.27 stemming from his alleged permanent injury.[6]

In answer to Ciha's petition, Quaker Oats denied Ciha had sustained a compensable, permanent injury to the body as a whole, and denied Ciha had incurred expenses compensable under section 85.27.

Ciha's claim proceeded to an arbitration hearing. *See* Iowa Code § 86.14. At the hearing, the parties stipulated that:

—An employment relationship existed between Ciha and Quaker Oats on the date of Ciha's claimed work-related injury, May 26, 1991;

—The alleged injury to Ciha caused temporary disability from May 27, 1991 to June 19, 1992;

—The alleged injury caused an industrial disability of disputed extent;

—Disputed medical expenses are causally connected to the alleged injury; and

---

4. Upon Ciha's return to work, Quaker Oats installed an automatic door specifically for his use. Also, a group of five Quaker Oats employees were responsible for assisting Ciha with transportation throughout the plant, changing his catheter bags, and knowing of his whereabouts at all times.

5. For workers' compensation purposes, Quaker Oats was a self-insured employer under Iowa Code § 87.4 (1991).

6. Ciha offered three affidavits into evidence at the arbitration hearing itemizing certain expenses Ciha incurred due to his alleged work-related injury. One affidavit listed $37,863 in expenses incurred for, among other things, a van modified to enable Ciha to drive independently. Of the $37,863, the costs to convert the van totaled $24,509. The second affidavit listed $20,788 in expenses incurred to make his home accessible to him. The third affidavit, signed by his wife Kim, itemized $58,447 in claimed home nursing care expenses.

—Quaker Oats was entitled to a credit for workers' compensation benefits paid voluntarily to Ciha.

The issues presented for resolution by the deputy industrial commissioner at the arbitration hearing included:

(1) whether Ciha sustained an injury arising out of and in the course of his employment;

(2) the extent of Ciha's claimed permanent disability;

(3) the proper rate of weekly compensation; and

(4) whether Ciha was entitled to claimed section 85.27 medical expenses including home modification, van purchase and modification and home nursing care provided by Ciha's wife.

After the hearing, the deputy made several findings of fact and conclusions of law now the focus of the present appeal. First, the deputy concluded Ciha sustained an injury arising out of and in the course of his employment. Relying on our decision in *Kyle v. Greene High School*, 208 Iowa 1037, 226 N.W. 71 (1929), the deputy concluded that, at the time of his accident, Ciha was performing a "special service or errand" for the benefit of his employer and that the task was a "duty incidental to the nature of his employment in the interest of, or under direction of, his employer." The deputy's reliance on the above-described "special errand" exception to the "going and coming" rule made it unnecessary for it to decide whether the "required vehicle" exception to the rule would also render Ciha's personal injury work-related for workers' compensation purposes.

Second, the deputy concluded Ciha had not "deviated" at the time of the accident so as to remove himself from the course of his employment. The deputy concluded:

The fact that [Ciha] chose, as his regular route, a trip that took perhaps five to seven minutes longer so that he might enjoy a more scenic and less traveled way does not establish a substantial deviation from his special errand.... Electing a slightly longer route home does not constitute a deviation from employment, and certainly not such a substantial deviation as to remove claimant from the course of his employment.

Third, the deputy considered the extent of industrial disability caused by Ciha's personal injury. The deputy concluded that, due to the severity of Ciha's injury and his compromised ability to compete for jobs in the competitive labor market (should he be required to), he had sustained a permanent partial industrial disability equivalent to eighty percent of the body as a whole, or four hundred weeks. *See* Iowa Code § 85.34(2)(u).

Fourth, the deputy concluded expenses incurred by Ciha for van conversion ($24,509), home modification ($20,788), various appliances (bed, gloves, exercise device, emergency portable telephone, clothing) ($1,014), and home nursing services ($58,447) provided by his wife were reasonable and thus compensable under Iowa Code section 85.27.[7]

Quaker Oats appealed the deputy's proposed decision to the industrial commissioner. *See id.* §§ 86.24(1), 17A.15(3). With some additional analysis, the commissioner agreed with and adopted the proposed decision of the deputy on all issues. The commissioner's decision thus became the final agency action. In an issue not decided by the deputy, the commissioner concluded Ciha's injury was also compensable under the "required vehicle" exception to the going and coming rule.

Quaker Oats next filed a petition for judicial review in district court to contest the decision of the commissioner. *See id.* §§ 17A.19, 86.26. On judicial review, the district court affirmed. From this final judgment, Quaker Oats appeals. *See id.* § 17A.20; Iowa R.App.P. 1.

■ III. *Scope of review.* Our review of this case is governed by Iowa Code chapter 17A, Iowa's administrative procedure act. *See* Iowa Code § 86.26; *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 264 (Iowa 1995). "Our review of administrative agency decisions—like that of the district court—is limit-

---

7. The deputy denied Ciha's claim, under Iowa Code § 85.27, for the purchase price of the van. Ciha has not cross-appealed for these denied expenses.

ed to correcting legal error. The findings of the commissioner are akin to a jury verdict, and we broadly apply them to uphold the commissioner's decision." *Second Injury Fund v. Shank*, 516 N.W.2d 808, 812 (Iowa 1994) (citation omitted).

We may reverse, modify, affirm or remand the case to the commissioner for further proceedings if we conclude the agency's action is affected by an error at law or if it is not supported by substantial evidence. Iowa Code § 17A.19(8); *Nelson*, 544 N.W.2d at 264. Evidence is substantial if a reasonable mind would find it adequate to reach a conclusion. *Shank*, 516 N.W.2d at 812. The commissioner's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence. *Id.* In such a case, we cannot interfere with the commissioner's conclusions. *Id.*

Although we give limited deference to the commissioner's interpretation of the workers' compensation statutes, *see* Iowa Code chs. 85, 85A, 85B, 86, 87, governing the division of industrial services, the proper interpretation of the statutes is a question of law for this court. *Nelson*, 544 N.W.2d at 264.

IV.  *Going and coming rule, the "special errand" and "required vehicle" exceptions, and deviation.* In Iowa,

> [e]very employer, not specifically excepted by the provisions of [Iowa Code chapter 85], shall provide, secure, and pay compensation according to the provisions of this chapter for any and all personal injuries sustained by an employee arising out of and in the course of the employment. . . .

Iowa Code § 85.3(1); *see id.* § 85.61(7). To obtain such compensation, an injured employee has the burden of proving by a preponderance of the evidence that his injuries arose out of and in the course of his employment. *See 2800 Corp. v. Fernandez*, 528 N.W.2d 124, 128 (Iowa 1995). An injury arises "out of" the employment when there is a causal relationship between the employment and the injury. *Fernandez*, 528 N.W.2d at 128. "In the course of" the employment concerns the time, place, and cir-

cumstances of the injury. *Id.* Stated more specifically,

> [a]n injury occurs in the course of the employment when it is within the period of employment at a place where the employee reasonably may be in performing his duties, and while he is fulfilling those duties or engaged in doing something incidental thereto. An injury in the course of employment embraces all injuries received while employed in furthering the employer's business and injuries received on the employer's premises, provided that the employee's presence must ordinarily be required at the place of the injury, or, if not so required, employee's departure from the usual place of employment must not amount to an abandonment of employment or be an act wholly foreign to his usual work. An employee does not cease to be in the course of his employment merely because he is not actually engaged in doing some specifically prescribed task, if, in the course of his employment, he does some act which he deems necessary for the benefit or interest of his employer.

*Farmers Elevator Co. v. Manning*, 286 N.W.2d 174, 177 (Iowa 1979) (quoting *Bushing v. Iowa Ry. & Light Co.*, 208 Iowa 1010, 1018, 226 N.W. 719, 723 (1929)); *see Fernandez*, 528 N.W.2d at 129.

First and foremost, Quaker Oats contends Ciha did not sustain his injury in the course of his employment because the injury was sustained away from the employer's premises and while Ciha was on his way home from the plant. The employer relies on the well established "going and coming" rule which generally provides: "[A]bsent special circumstances, injuries occurring off the employer's premises while the employee is on the way to or from work are not compensable." *Fernandez*, 528 N.W.2d at 129; *see Frost v. S.S. Kresge Co.*, 299 N.W.2d 646, 648 (Iowa 1980); *Manning*, 286 N.W.2d at 178; *Bulman v. Sanitary Farm Dairies*, 247 Iowa 488, 492, 73 N.W.2d 27, 29 (1955). Under this rule, "the hazards encountered by the employee in going to or returning from work are not ordinarily incident to his employment within the meaning of the phrase as used in the work[ers'] compensation law."

*Bulman,* 247 Iowa at 492, 73 N.W.2d at 29; *see Pribyl v. Standard Elec. Co.,* 246 Iowa 333, 339, 67 N.W.2d 438, 442 (1954) ("Ordinarily an employee whose work begins when he arrives in the morning is *engaged in his own business* when he travels to work at the regular time. He is not then pursuing his master's business.").

Under the going and coming rule, Ciha admittedly did not sustain an injury in the course of his employment: he was injured while driving his motorcycle home from the Quaker Oats plant.

▇▇▇ There are, however, several exceptions to the going and coming rule that " 'extend the employer's premises under certain circumstances when it would be unduly restrictive to limit coverage of compensation statutes to the physical perimeters of the employer's premises.' " *Fernandez,* 528 N.W.2d at 129 (quoting *Frost,* 299 N.W.2d at 648–49).

The commissioner concluded two exceptions to the going and coming rule validate the alleged compensability of Ciha's claim: the "special errand" exception and the "required vehicle" exception. On appeal, Quaker Oats contends substantial evidence does not support this conclusion.

▇▇▇▇ A. *Special errand exception.* The first exception to the going and coming rule relied on by the commissioner is the "special errand" exception. *See Golay v. Keister Lumber Co.,* 175 N.W.2d 385, 388 (Iowa 1970); *Bulman,* 247 Iowa at 494, 73 N.W.2d at 30; *Pribyl,* 246 Iowa at 339, 67 N.W.2d at 442; *Otto v. Independent Sch.*

*Dist.,* 237 Iowa 991, 994, 23 N.W.2d 915, 916 (1946); *Kyle,* 208 Iowa at 1040, 226 N.W. at 72. Under the exception, if an employee is on a special errand or mission for his or her employer at the time of the injury, the injury is held to have arisen in the course of employment. In *Pribyl,* we stated an employee

> would be pursuing his master's business if his trip to and from the employer's premises were a special trip made in response to a special request, agreement or instructions to go from his home to the plant to do something for the employer's benefit. In that case it is clear the entire trip would be his master's business and by all authorities would be held to be in the course of the employment.

*Pribyl,* 246 Iowa at 339, 67 N.W.2d at 442. We have further explained the special errand exception as follows:

> [T]he going and coming rule is [not] dependent on the extent of the hazards of travel. It is based rather on contract, express or implied. If the employer assumes the burden of the workman's coming and going expense, that is held to imply that the *time* of coming and going is a part of the time of employment. Or *when the employer sends [the employee] on a special mission·apart from his usual employment, the coming and going time of such mission is implied to be within the course of employment.*

*Bulman,* 247 Iowa at 494, 73 N.W.2d at 30 (emphasis added).[8] In special errand cases, we typically ask the following question: "Whose business was [the employee] pursu-

---

8. Professor Larson describes the special errand exception as follows:

> When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.... [S]everal variables must be taken into account. One is the relative regularity or unusualness of the particular journey. If it is relatively regular, whether every day, ... or at frequent intervals,

> ... the case begins with a strong presumption that the employee's going and coming trip is expected to be no different from that of any other employee with reasonably regular hours and place of work. The fact that these reasonably regular hours include some evening work does not change the essential [going and coming] rule. The other two principal variables, however, are the relative onerousness of the journey compared with the service to be performed at the end of the journey.... The term "onerousness" here includes both length and circumstances.... The suddenness of the call might also be a factor.

1 Arthur Larson, *The Law of Workmen's Compensation* § 16.11, at 4–204; § 16.13, at 4–208.24—.26 (1994).

ing at the time of the injury?" *Pribyl,* 246 Iowa at 340, 67 N.W.2d at 442.

Quaker Oats contends that the commissioner and district court erred by relying on our decision in *Kyle* to find Ciha's injury arose out of and in the course of his employment under the special errand exception to the going and coming rule. Ciha's decision to drive to the plant to fix the faltering cooling fans, argues Quaker Oats, was not a special errand; as the 204 supervisor on duty, responding to problems at the plant was part of his regular job responsibilities.

In opposition to Quaker Oats' position, Ciha contends his decision to drive to the plant to remedy the cooling fan problem was a special errand. Relying on the *Kyle* decision, as did the commissioner and district court, Ciha requests we affirm the decision finding his injury arose out of and in the course of employment.

After considering all arguments raised by the parties, we believe substantial evidence supports the commissioner's conclusion that Ciha was on a special errand at the time of his injury.

At the time Ciha was paged concerning the problem with the cooling fans, he was already getting paid for eight hours of straight time for forty-eight hours of 204 supervisor weekend duty. As he had never been paged before while on 204 duty and was actually at the plant for a short time on the morning of his accident, it is clear he did not expect to be contacted later that day. When contacted, however, he personally responded to the problem at the plant, instead of contracting out to remedy the problem. He responded immediately and effectively within his sole discretion as 204 supervisor.

204 supervisory duty was not part of an area maintenance supervisor's written job description. All maintenance supervisors were informed, however, about the occasional weekend responsibilities that accompanied the position. The area maintenance supervisor assigned as 204 supervisor on a given weekend was required to respond to mechanical breakdowns at any location in the entire plant, as opposed to his specific area that he was responsible for Monday through Friday.

In a typical year, a maintenance supervisor is on weekend duty five times and there is no regularity to the number of times he or she may be contacted in that forty-eight hour time period while on-call each weekend. In fact, Ciha was contacted for the first time while on 204 duty on May 26, 1991, the date of his accident. Testimony at the arbitration hearing showed that only a "low percentage" of the time that a supervisor was on 204 duty was he actually required to go to the plant to remedy a problem.

While on 204 duty, the supervisor must remain near the plant and must have instant access to transportation to get to the plant if needed. No one benefits more from the 204 supervisor personally responding to the emergency than Quaker Oats.

We believe the unique facts in the present case constitute substantial evidence to support the commissioner's conclusion that the special errand exception to the going and coming rule caused Ciha's injury to arise out of and in the course of his employment. Moreover, in answer to the question posed in *Pribyl,* 246 Iowa at 340, 67 N.W.2d at 442, "[w]hose business was [the employee] pursuing at the time of the injury?," the answer must be Quaker Oats' business. The fact that Ciha was contacted on Sunday while he was on 204 duty was truly "special:" it was unusual, sudden, and unexpected.

Our conclusion is not inconsistent with our interpretation of the special errand exception in other cases. *See, e.g., Bulman,* 247 Iowa at 494, 73 N.W.2d at 30 (substitute truck driver employee was not on a special errand at the time he was injured on his trip home after completing another driver's delivery route; employee was not involved in a mission "special" from that which he would typically perform as a substitute driver); *Pribyl,* 246 Iowa at 343, 67 N.W.2d at 444 (employee electrician was on a special errand at the time he was killed while driving to a work site; employee was required to travel to the work site by his own means and was to be reimbursed eight cents per mile by the employer); *Pohler v. T.W. Snow Constr. Co.,* 239 Iowa 1018, 1027–28, 33 N.W.2d 416, 420–21 (1948) (employee construction supervisor was on a special errand at the time he was

killed by freight train while returning to his temporary home; employee was stationed out-of-state for three weeks to complete a railroad excavation project); *Otto*, 237 Iowa at 999, 23 N.W.2d at 919 (concluding employee janitor was not on a special errand at the time he was injured on his trip to work; employee was injured as he made his daily trip to school as he did every weekday morning); *Kyle*, 208 Iowa at 1041–42, 226 N.W. at 73 (concluding employee janitor was on a special errand at the time he was killed while walking back to school to turn on the gymnasium lights; employee was requested to return to work outside of his regular working hours after he had returned home for the day to perform an urgent and unexpected duty).

As we believe Ciha was performing a special errand for the benefit of his employer at the time of the motor vehicle accident, we need not decide whether Ciha's injury is also compensable under the "required vehicle" exception to the going and coming rule.

■ B. *Deviation.* Notwithstanding our conclusion that the special errand exception to the going and coming rule applies in the present case, Quaker Oats contends Ciha had "deviated" from his trip home from the plant to such an extent that he abandoned his employment at the time of the accident. The commissioner and district court rejected this argument, and we do the same.

■ Even though Ciha was on a special errand for his employer at the time of the accident, his injury is not compensable if he is found to have "deviate[d] sufficiently from the line of duty so that his or her actions are foreign to the employer's work...." *Sheerin v. Holin Co.*, 380 N.W.2d 415, 417 (Iowa 1986) (question of whether injury was preceded by a departure from the course of employment precluded employer's motion for summary judgment); *see Volk v. International Harvester Co.*, 252 Iowa 298, 304–05, 106 N.W.2d 649, 652 (1960) (employee who was killed in a one-car accident had deviated from his employment at the time of his injury; employee, whose meals, lodging, and other traveling expenses were provided by his employer, drove to three taverns and was killed on his trip back to his motel room);

*Pohler*, 239 Iowa at 1023–24, 33 N.W.2d at 419 (employee who was killed by a freight train did not "abandon" his employment when, after completing a special errand for the benefit of his employer, he walked two blocks to telephone his wife; the two block trip to make the call was a deviation, but he was killed after his deviation ended; a two hour delay in waiting to get his telephone call through was immaterial to the court's analysis); *Bushing*, 208 Iowa at 1017, 226 N.W. at 722 (employee found dead on employer's premises at a place where none of his duties were to be performed was held to have sustained an injury in the course of his employment; "[u]nder the instant facts, there is no evidence of a total departure from the course of the employment, nor an abandonment of his work by the employee.").

Ciha readily admits that the Ellis road route that he was driving at the time of his accident was not the most direct route from the plant to his home, that the Ellis route is approximately four and one-half miles longer than the most direct route that was available to him, and that he was planning to run a ten kilometer race along the Ellis road route the next day. Ciha contends, however, and we agree, that these factors are not sufficient to establish Ciha "abandoned" his employment as required under the deviation rule to remove him from the course of employment. *See Pohler*, 239 Iowa at 1023–24, 33 N.W.2d at 419; *Bushing*, 208 Iowa at 1017, 226 N.W. at 722. Only substantial evidence need be present to uphold the commissioner's decision. In concluding Ciha did not deviate from his special errand, the commissioner stated:

> [Ciha] testified that he often took [the Ellis road] route home because it was more scenic, it had less traffic, it had fewer stop lights, and the actual difference in miles between this route and the more direct route was minimal. [Ciha's] call to his wife from the plant to start the grill for their meal shows that his purpose was to return home, and that he had no other destination other than to return to his residence. The record does not show a deviation from the course of the employment.

We believe the findings and conclusion above are supported by substantial evidence. The above findings are adequate to reach the conclusion made by the commissioner that there was no dual purpose to the trip home or substantial deviation from or abandonment of the employment at the time Ciha sustained his injury.

Therefore, we conclude Ciha had not deviated from his employment at the time of his accident.

V. *Claimed expenses under Iowa Code section 85.27.* Of the expenses awarded by the commissioner under Iowa Code section 85.27, Quaker Oats only challenges the award of costs for home modifications, van conversion, and home nursing services. The commissioner and district court found the home modification and van conversion expenses to be reasonable "appliances" under section 85.27. In addition, the commissioner found the claimed expenses for home nursing services and the claimed value of those services to be reasonable.[9]

Iowa Code section 85.27 provides in pertinent part:

The employer, for all injuries compensable under this chapter or chapter 85A, shall furnish reasonable surgical, medical, dental, osteopathic, chiropractic, podiatric, physical rehabilitation, nursing, ambulance and hospital services and supplies therefor and shall allow reasonably necessary transportation expenses incurred for such services. The employer shall also furnish reasonable and necessary crutches, artificial members and appliances....

■■■ Whether Ciha's claimed expenses for home modifications, van conversion, and home nursing services are reasonable expenses under section 85.27 are separate questions of fact. *See Manpower Temporary Servs. v. Sioson,* 529 N.W.2d 259, 263 (Iowa 1995). The commissioner found the expenses to be reasonable and these findings must be affirmed if supported by substantial evidence. *Id.* at 263–64. The same is true in regard to whether the claimed value of the home nursing services is reasonable. *See*

*Allen v. Allen Water & Wastewater Engineering, Inc.,* 549 N.W.2d 516, 518 (Iowa 1996) ("[I]t is generally accepted that questions of fact are to be resolved by the agency and are given substantial weight on judicial and other appellate review.").

■■■ A. *Home modifications and van conversion.* In order for Ciha to have been able to access his house in a wheelchair upon his return from Craig Hospital, various home modifications were required. The home modifications included widened doorways, a ramp into the home, a special shower, an elevator, and other items necessitated by Ciha's wheelchair-bound status. He also incurred van conversion expenses in order to be able to return to work full-time.

In his workers' compensation claim, Ciha sought and was awarded $20,788 in home modification expenses and $24,509 in van conversion expenses under Iowa Code section 85.27. The deputy concluded the home modification expenses incurred by Ciha "relate to items designed to substitute for function lost in [his] work injury." Relying on past agency decisions, the commissioner also held Quaker Oats responsible for the van conversion expenses. The commissioner further concluded:

[Ciha's] need for a ramp to enter his home, and for a special shower designed to accommodate a wheelchair, are held to be necessary and reasonable medical expenses. All of the items are related to accommodating [Ciha's] wheelchair. An appliance has been held to be a device that serves to replace a physical function lost by the injury. [Iowa Admin.Code r. 343–8.5 (1996) ]. Just as a wheelchair seeks to replace the lost functions of standing and walking, a wheelchair ramp, a wheelchair shower, etc. also seek to replace physical functions claimant possessed before the work injury but has now lost.

Quaker Oats contends on appeal that the claimed home modification and van conversion costs are not compensable as "appliances" under Iowa Code section 85.27. Rely-

---

9. On appeal, Quaker Oats concedes that if Ciha's injury is deemed compensable under Iowa Code chapter 85, then section 85.27 requires it to furnish "reasonable ... nursing ... services." Quaker Oats only disputes the amount of nursing expenses claimed by Ciha.

ing on rules of statutory construction and decisions from other jurisdictions, the employer argues the language of section 85.27 simply does not permit the award sought by Ciha.[10]

Notwithstanding the conflicting out-of-state authority on this issue, if substantial evidence supports the commissioner's conclusion that the home modifications and/or van conversion qualify as reasonable "appliances" under section 85.27, then we must find the expenses compensable. Quaker Oats does not dispute that the cost of Ciha's wheelchair is compensable under section 85.27; therefore, the question becomes whether the home modifications and van conversion completed to accommodate an admittedly covered appliance (a wheelchair) are compensable under the same statute.

An "appliance" is defined as

hearing aids, corrective lenses, orthodontic devices, dentures, orthopedic braces, or any other artificial device used to provide function or for therapeutic purposes.

Appliances which are for the correction of a condition resulting from an injury ...

are compensable under Iowa Code section 85.27.

Iowa Admin.Code r. 343–8.5 (1996). We have defined "appliance" as "a means to an end." *Sioson*, 529 N.W.2d at 264. "Function" is defined as "[t]he nature and proper action of anything...." Black's Law Dictionary 673 (6th ed. 1990).

In *Sioson*, 529 N.W.2d at 264, we considered whether a modified van awarded to an injured employee constituted medical care, an appliance, or transportation under section 85.27. In that case, we concluded the following:

Although factual situations supporting [a finding of compensability for a modified van] would be extremely rare, we, like the district court, agree that the commissioner could find one here.

We begin with the unusually strong medical evidence of necessity and of the record that [the claimant's] family status and past lifestyle reveal no other use for the van. That evidence refutes any contention that the van is a frill or luxury and

10. There is little uniformity in the various jurisdictions that have considered issues concerning the compensability of home modifications and van conversions. *See, e.g., R & T Constr. Co. v. Judge*, 323 Md. 514, 594 A.2d 99, 107–08 (1991) (injured employee denied compensation for claimed home modification expenses and wheelchair accessible van; although the modifications improved employee's quality of life, they were not necessities to medical treatment; van was not a prosthetic or medical appliance); *Kranis v. Trunz, Inc.*, 91 A.D.2d 765, 458 N.Y.S.2d 10, 11 (App.Div.1982) (injured employee denied compensation for specially-equipped automobile; automobile was not a medical apparatus and, therefore, insurer was not required to absorb the costs); *McDonald v. Brunswick Elec. Membership Corp.*, 77 N.C.App. 753, 336 S.E.2d 407, 409 (1985) (employee denied compensation for specially-equipped van; van not included within statutory terms of "other treatment or care" or "rehabilitative services"); *Savaria v. DiSano*, 118 R.I. 357, 373 A.2d 820, 822 (1977) (injured employee denied compensation for an automatic lift to accommodate the employee's wheelchair; claimed automatic lift was convenient but not medical in nature); *Johnson v. Skelly Oil Co.*, 359 N.W.2d 130, 134–35 (S.D.1984) (employer/insurer denied injured employee compensation for specially-equipped van; whether the van constituted "other suitable and proper care" so as to require reimbursement from the employer/insurer was a question of fact for the agency

to determine, not the courts on appeal; remand to agency on this issue); *Low Splint Coal Co. v. Bolling*, 224 Va. 400, 297 S.E.2d 665, 667–68 (1982) (injured employee denied compensation for claimed home modification expenses; claimed expenses did not qualify as "necessary medical attention" or "reasonable and necessary vocational rehabilitation training services" under statute). *But see Terry Grantham Co. v. Industrial Comm'n*, 154 Ariz. 180, 741 P.2d 313, 316 (Ct.App.1987) (injured employee compensated for home modification and van; van considered "other apparatus" under statute); *Applegate Drywall Co. v. Patrick*, 559 So.2d 736, 737 (Fla.Dist. Ct.App.1990) (employer compensated injured employee for wheelchair-accessible van; van conceded to be medical benefit under statute); *Fidelity & Cas. Co. v. Cooper*, 382 So.2d 1331, 1332 (Fla.Dist.Ct.App.1980) (injured employee compensated for expenses to modify motorcycle; modifications properly awarded as "other apparatus" which "the nature of the injury" may require); *Meyer v. North Dakota Workers Compensation Bureau*, 512 N.W.2d 680, 684 (N.D. 1994) (injured employee compensated for excess costs of purchasing a van to accommodate his injury and the adaptive equipment needed to modify the van); *Crouch v. West Virginia Workers' Compensation Comm'r*, 184 W.Va. 730, 403 S.E.2d 747, 751 (1991) (injured employee compensated for difference between cost of handicapped-equipped van and the cost of an average, mid-priced automobile, of the same year).

reveals what can be described as an appliance, not greatly different from crutches or a wheelchair. The point is that a van is necessary in order to make [the claimant's] wheelchair fully useful.

*Id.* Unlike in *Sioson*, the commissioner in the present case did not award Ciha the purchase price of the van but only the cost to modify the van to accommodate his physical disability.

Considering the above definitions and the quoted statements in the *Sioson* case, we believe the conclusion reached by the commissioner in the present case is sound. We find that the home modifications and van conversion are "other artificial device[s]" constructed to provide "function" for Ciha. As in *Sioson*, we believe the specific home modifications and van conversion are merely an extension of Ciha's wheelchair. *See Sioson*, 529 N.W.2d at 264. "Without a van [he] is, more than need be, a prisoner of [his] severe paralysis." *Id.* The commissioner could thus reasonably view the home modifications and van conversion as appliances, a necessary part of Ciha's care.

Under the unique facts of the present case, we conclude substantial evidence supports the commissioner's ruling that the home modifications and van conversion were reasonable appliances under Iowa Code section 85.27.

■ B. *Home nursing services.* In addition to the claimed home modification and van conversion expenses, Ciha also sought $58,447 in home nursing services performed by his wife after his return home from the hospital in Colorado. At the arbitration hearing, Quaker Oats unsuccessfully contended the claimed home nursing services were not reasonable expenses under section 85.27, and also that the claimed amount of the services set forth in an affidavit prepared by Kim Ciha was unreasonable.

On appeal, Quaker Oats does not dispute that it had a duty under Iowa Code section 85.27 to provide reasonable nursing services to Ciha if his injury was compensable (which we have concluded it is). In addition, Quak-

er Oats agrees the services performed by Kim were "nursing" services as contemplated by section 85.27.[11] Quaker Oats contends, however, that $58,447 in home nursing expenses claimed by Ciha is unreasonable. The commissioner and district court disagreed and we must affirm this decision if supported by substantial evidence.

In ordering Quaker Oats to pay Ciha's home nursing services, the commissioner stated the following:

> The record shows that [Ciha's] wife received special training to perform the functions of a nurse for her husband, including digital manipulation to stimulate a bowel movement.
>
> . . . .
>
> In the instant case, [Ciha's] spouse, although not a nurse or LPN, did have to receive special training to perform the services. The services themselves are clearly medical nursing services and not general care services such as dressing, bathing, feeding, etc. [Ciha's] spouse's nursing services are held to be compensable under Iowa Code section 85.27.
>
> [Quaker Oats] also disputes the amount of the nursing services claimed. [Ciha] bears the burden of proof on this issue. [Ciha] has provided evidence obtained from other home nursing services in the area as to what would be charged if the same services were performed by a nurse. Although those quoted rates contain a minimum amount of time that may not actually be consumed by [Ciha's] spouse performing the services, nevertheless the costs quoted are reasonable and there is no contrary evidence in the record. [Ciha] has carried his burden to show by a preponderance of evidence that the charges claimed are reasonable.

■ In its appeal brief, Quaker Oats assails the calculations and hourly rates used by Kim Ciha to compute the value of the claimed home nursing services. The employ-

---

11. Based on this concession, our decision in *Henry v. Iowa–Illinois Gas & Electric Co.,* 522 N.W.2d 301 (Iowa 1994), is not implicated in the present appeal.

er also contends the evidence presented by Ciha on this issue, the cost affidavit, was not competent.[12] The employer, however, presented no evidence at the arbitration hearing to support an amount of home nursing services less than the $58,447 claimed by Ciha. Our duty on an appeal of a judicial review case from the district court is to determine whether the agency's decision is supported by substantial evidence, not to entertain new evidence or facts not presented to the agency.

Ciha contends the costs set forth in Kim's affidavit are reasonable, and the affidavit and her testimony amount to substantial evidence in support of the commissioner's finding of reasonableness. We believe the affidavit and Kim's testimony establish the reasonableness of the claimed home nursing care expenses by a preponderance of the evidence. We conclude substantial evidence supports the commissioner's finding on this issue.

▆▆ VI. *Industrial disability.* As a final issue, Quaker Oats contends the commissioner erred in ruling that Ciha had sustained an eighty percent permanent partial industrial disability. Quaker Oats argues Ciha's disability is only fifty to sixty percent because it, Ciha's employer, went to great lengths to accommodate claimant and also that claimant has suffered no loss of earnings.

▆▆ As we have stated on many occasions, "[i]ndustrial disability measures an injured worker's lost earning capacity." *Nel-*

son, 544 N.W.2d at 265; *see, e.g., Shank,* 516 N.W.2d at 813; *Mortimer v. Fruehauf Corp.,* 502 N.W.2d 12, 14 (Iowa 1993). Industrial disability is used to determine an unscheduled disability under Iowa Code section 85.34(2)(u). Factors that should be considered include the employee's functional disability,[13] age, education, qualifications, experience, and the ability of the employee to engage in employment for which the employee is fitted. *Shank,* 516 N.W.2d at 813. "Thus, the focus is not solely on what the worker can and cannot do; the focus is on the ability of the worker to be gainfully employed." *Nelson,* 544 N.W.2d at 266.

As a result of the accident and resulting quadriplegia, Ciha is wheelchair-bound, cannot control his bowel functions, and his lifestyle has been severely limited from that prior to the injury. He requires extensive, daily care and attention by his wife, relatives, and co-workers as he no longer has the ability to perform many basic daily living functions. Also, as a thirty-eight year old man, it cannot be reasonably disputed that Ciha's employability outside of the Quaker Oats workforce has been significantly and negatively affected by his injury. Although we applaud the efforts of Quaker Oats in modifying the workplace to accommodate Ciha's disability, such efforts are not determinative of Ciha's industrial disability rating. *See Thilges v. Snap–On Tools Corp.,* 528 N.W.2d 614, 617 (Iowa 1995) ("[W]e are satisfied that the commissioner was correct in viewing loss of earning capacity in terms of the injured worker's present ability to earn in the com-

---

12. At the arbitration hearing, Quaker Oats objected to the admissibility of Kim Ciha's affidavit itemizing the claimed value of the home nursing services. Quaker Oats also objected to questions posed to Kim regarding the costs set forth in the affidavit. In an objection, Quaker Oats claimed the affidavit and her testimony regarding the information contained in the affidavit constituted hearsay evidence and the exhibit and the elicited testimony was expert testimony without proper foundation. The deputy overruled the objection. *See* Iowa Code § 17A.14 (stating all reliable evidence is admissible in an agency contested case proceeding provided the evidence is not privileged, irrelevant, immaterial, or unduly repetitious). The cost affidavit was admitted into evidence and Kim testified concerning the costs associated with providing home nursing care to

someone in her husband's quadriplegic condition.

Although Quaker Oats claims on appeal that the claimed costs are not reasonable, it does not challenge the deputy's ruling on its objection. Therefore, we consider the affidavit admissible on this issue as did the commissioner and district court.

13. Functional disability is used to determine a specific scheduled disability under Iowa Code § 85.34(2)(a)-(t). In such a case, the disability is arrived at "by determining the impairment of the employee's body function and is limited to the loss of the physiological capacity of the body or body part." *Shank,* 516 N.W.2d at 813.

petitive job market without regard to the accommodation furnished by one's present employer.").

In finding eighty percent industrial disability, the commissioner concluded the following:

> [D]efendant [Quaker Oats] has gone to great effort to accommodate claimant's [Ciha's] devastating disability. Defendant has set up a team of five co-employees to assist claimant, installed a special elevator, etc. These efforts are very appropriate, and defendant is to be commended for putting claimant back to work under difficult circumstances. However, defendant also obtains an advantage by doing so in that claimant's disability is reduced from what it otherwise would be. Although claimant's position is not a "make work" job and involves a significant contribution to his employer, nevertheless if claimant were to be suddenly thrust into the job market, his ability to compete with other workers for positions would be limited in the most extreme sense. Clearly, without the accommodation, claimant's disability would be permanent and total. Claimant's industrial disability is found to be [eighty] percent.

We conclude there is substantial evidence to support the commissioner's decision on this issue.

VII. *Disposition.* The district court is affirmed on all issues. Costs on appeal are taxed to Quaker Oats.

**AFFIRMED.**