Modesto **PAULINO,** Plaintiff,

v.

**CHARTIS CLAIMS, INC., f/k/a AIG Claims Services, Inc.,** Defendant.

No. 3:11–CV–00096–JEG.

United States District Court, S.D. Iowa, Davenport Division.

May 3, 2013.

William J. Bribriesco, William J. Bribriesco & Associates, Bettendorf, IA, for Plaintiff.

Coreen K. Sweeney, Stephanie Lynn Marett, Nyemaster Goode West Hansell & O'Brien PC, Des Moines, IA, for Defendant.

**ORDER**

JAMES E. GRITZNER, Chief Judge.

This matter comes before the Court on Motion for Summary Judgment brought by Defendant Chartis Claims, Inc., f/k/a AIG Claims Services, Inc.[1] (Chartis). Plaintiff Modesto Paulino (Paulino) resists. The Court held a hearing on the Motion on April 11, 2013. Attorneys Coreen K. Sweeney and Stephanie L. Marett appeared on behalf of Chartis, and attorney William J. Bribriesco appeared on behalf of Paulino. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

The following facts are either not in dispute or taken in the light most favorable to Paulino as the nonmovant. *See Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 739 (8th Cir.2009). On October 2, 2004, Paulino was working for C–Tec, Inc. (C–Tec), his employer, on a grain bin when he fell approximately seventy feet. Chartis insured C–Tec for any workers' compensation benefits that were to be provided to Paulino. At the time of the fall, Paulino was a Mexican national who did not have proper documentation to work in the United States. The fall fractured several of Paulino's vertebrae and severed his spinal cord, rendering him a permanent paraplegic and wheelchair bound. Paulino was treated in Des Moines, Iowa, and then transferred to the Rehabilitation Institute of Chicago for intensive impatient rehabilitation. On January 4, 2005, Paulino was transferred to the Center for Comprehensive Services (CCS) in Carbondale, Illinois, which is a post-acute rehabilitation center for patients with acquired brain and spinal cord injuries. CCS's treatments were designed to prepare Paulino for a permanent independent living arrangement, and at the time Paulino was transferred to CCS, it was initially projected that he would require a three-to-five month stay at CCS. Paulino indicated that, upon discharge, he would like to live in Chicago, and CCS began making arrangements for an appropriate discharge.

While at CCS, Paulino's medical situation continued to improve, and he continued to progress toward the goal of living in his own home in Chicago upon discharge from CCS. According to a March 20, 2006, progress report, Paulino was independent in meal preparation and consumption, accessed the community independently and was independent with catheterizations, and his anticipated discharge date was listed as April 30, 2006. CCS created a discharge plan indicating that upon discharge, Paulino should have wheelchair accessible housing, an electric hospital bed, a personal care attendant, and access to public transportation. Chartis retained a case manager who, throughout the month of April, sought to arrange a satisfactory living situ-

---

1. Paulino's Petition identifies Defendant as "AIG Claims Services d/b/a Commerce and Industry Insurance Company k/n/a Chartis, Inc." Notice of Removal, Pet. ¶ 2, ECF No. 1–1. Defendant denied that it has done busi-

ness as Commerce & Industry Ins. Co. and asserts it should be addressed as "Chartis Claims, Inc., f/k/a AIG Claims Services, Inc." Def. Ans. ¶ 2, ECF No. 5.

ation for Paulino upon discharge from CCS.

Finding housing that could be modified to meet CCS's requirements proved difficult for a number of reasons. First, Paulino believed that Chartis was required to pay for his housing. Second, Paulino faced a combination of external circumstances that made it difficult for him to find housing that he could afford that could be modified by CCS; he is "a paraplegic who is a migrant worker from Mexico with a third grade education, poor English skills, no social security number, no credit history and an income of only $388.00 per week from workers compensation." Order on Judicial Rev. 20, Def.App. 55, ECF No. 11–3.[2] Because Paulino was undocumented, he was unable to take advantage of state and federal assistance programs that would help him afford housing. While Chartis was willing to pay for modifications to an apartment, many landlords will not allow modification to be made to an apartment to accommodate Paulino's wheelchair, and those that would permit such modifications required a long-term lease, a sizeable deposit, and proof of steady income beyond Paulino's $388.00 per week. In short, "Paulino cannot just move to Chicago and rent an apartment." Order on Judicial Rev. 20, Def.App. 55, ECF No. 11–3.

As April 30 approached, Chartis proposed discharging Paulino to a hotel for thirty days while permanent housing was located. This option was rejected by Paulino's case manager at CCS, who testified that under federal regulations, Paulino could not be discharged to a non-permanent living arrangement that was not adequately adapted for Paulino's needs. The state district court noted in its findings that while Chartis continued to state that

it would authorize payment for Paulino's medical expenses and would pay to modify Paulino's permanent home, it also continued to warn Paulino that it would not authorize payment for Paulino to stay at CCS once it was no longer medically necessary for him to stay there. Paulino was not discharged from CCS on May 6, 2006, and at that time, Chartis withdrew its authorization for Paulino's continued residence at CCS. Despite Chartis' withdrawal of authorization, Paulino remained at CCS where he continued to accumulate charges varying from $18,000 to $23,250 per month.

On May 24, 2006, Paulino filed a Petition with the Iowa Workers' Compensation Commissioner seeking alternate medical care under Iowa Code § 85.27. An arbitration hearing was held before Deputy Commissioner David Rasey on September 6, 2007. Chartis argued that continued residence at CCS was not reasonable because the expenses included "clearly non-medical expenses such as rent, food, utilities and cable TV services." Dep. Comm'r Arb. Dec. 7, Def.App. 24, ECF No. 11–3. Deputy Commissioner Rasey issued a proposed decision on October 30, 2007, finding that Paulino was not entitled to an award of medical benefits in the form of living expenses at CCS after May 6, 2006. Specifically, the deputy found that Paulino did not establish that Chartis "failed to provide reasonable care" and that Paulino's "unrealistic insistence that defendants bear liability for nonmedical living expenses such as food, rent and utilities [was] also a contributing complication" to his inability to find suitable housing. Dep. Comm'r Arb. Dec. 7, Def.App. 24, ECF No. 11–3. The deputy also found that Paulino did not meet his burden of proof and failed to establish that the disputed

---

**2.** The Petition for Judicial Review of the Agency action, pursuant to Iowa Code § 17A. 19, was decided by Chief Judge Arthur E.

Gamble, in the Iowa District Court for Polk County, on July 1, 2009. *See* text *infra* at 1056.

costs were reasonable or that they were the type of costs Chartis was required to pay under § 85.27. Accordingly, Deputy Commissioner Rasey denied Paulino's claim for alternate medical care.

Paulino appealed the proposed decision to Commissioner Christopher Godfrey. As an initial matter, Commissioner Godfrey noted that the "issue of contention" was whether Paulino's continued stay at CCS was "medically necessary" even though Chartis would be required to pay nonmedical living expenses. Appeal Decision 3, Def.App. 29, ECF No. 11–3. After noting the difficulty Chartis encountered finding Paulino suitable living conditions, which was due, in part, to Paulino's incorrect expectations that Chartis was responsible to permanently pay for his living arrangements, Commissioner Godfrey concluded that Paulino's continued stay at CCS beyond May 6, 2006, was "a reasonable and necessary medical expense" and was therefore compensable under § 85.27. Appeal Decision 6, Def.App. 32, ECF No. 11–3. Commissioner Godfrey noted that living expenses, while generally not compensable after an injury, were recoverable due to the special circumstances of this case. He further noted that the "moral, ethical, and legal obligation of CCS" would not allow the facility to discharge Paulino until a permanent living situation had been arranged; and, accordingly, Chartis was required to pay Paulino's living expenses at CCS until a suitable residence could be arranged. Appeal Decision 8, Def.App. 34, ECF No. 11–3.

Chartis sought review of this decision in the Iowa District Court for Polk County, and the petition was denied on July 1, 2009, by the Honorable Arthur E. Gamble, Chief Judge of the Fifth Judicial District of Iowa, who also noted that living expenses, while rarely given, were an appropriate award in this extraordinary case. Regarding Commissioner Godfrey's legal conclusions, Judge Gamble, found that "given the extraordinary facts of this case, Paulino's claimed expenses do not as a matter of law fall outside the purview of section 85.27." Order on Judicial Rev. 20, Def.App. 55, ECF No. 11–3. Regarding the Commissioner's factual finding that the expenses were reasonable and necessary, Judge Gamble noted that Commissioner Godfrey had made credibility determinations regarding the dispute as to the conditions of Paulino's discharge and that the court must give appropriate deference to agency findings, even where the evidence is in conflict or where reasonable minds might disagree about the conclusion to be drawn from the evidence. The court concluded substantial evidence supported Commissioner Godfrey's factual finding that the expenses were "reasonable and necessary" as required by § 85.27. Order on Judicial Rev. 23, Def.App. 58, ECF No. 11–3.

On April 26, 2011, Paulino filed a petition against Chartis in the Iowa District Court for Scott County alleging bad faith denial of benefits as of May 6, 2006, and seeking consequential and punitive damages, including past and future medical expenses, pain and suffering, including mental anguish, and permanent injury and disability, as well as lost wages and future loss of earning capacity. Chartis removed the action to this Court on July 28, 2011.

## II. DISCUSSION

### A. Jurisdiction

▮ Subject matter jurisdiction in this case is based on diversity. On April 26, 2011, Paulino filed a petition in the Iowa District Court for Scott County against Chartis. On June 29, 2011, Chartis' agent was served with the petition, original notice, and jury demand. Defendant timely filed a Notice of Removal on July 28, 2011. Paulino did not contest the removal. Ac-

cording to Paulino's Petition, he is a resident of Jackson County, Illinois; and Chartis is a Delaware corporation, and its principal place of business is in New York. Complete diversity between the parties exists. Diversity jurisdiction requires an amount in controversy greater than $75,000. 28 U.S.C. § 1332(a). A complaint alleging the jurisdictional amount in good faith will suffice to confer jurisdiction unless it appears to a legal certainty that the claim is for less than the jurisdictional amount. *Larkin v. Brown*, 41 F.3d 387, 388 (8th Cir.1994). Consistent with Iowa pleading rules, Paulino's petition did not state a specific dollar amount. Iowa R. Civ. P. 1.403(1). Plaintiff seeks damages for, among other things, past and future pain and suffering, including mental anguish, as well as punitive damages. Chartis' Notice of Removal acknowledges that Plaintiff's alleged compensatory and punitive damages exceed $75,000. Although the specific amount of the claim is somewhat elusive on this record, Plaintiff asserts it exceeds the jurisdictional amount, and it does not appear to a legal certainty that Paulino's alleged damages are less the than the jurisdictional amount; therefore, this Court may properly exercise diversity jurisdiction over this case. *See Kopp v. Kopp*, 280 F.3d 883, 884–85 (8th Cir.2002).

## B. Summary Judgment Standard

When considering a motion for summary judgment, the Court " 'must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.' " *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir.2009) (quoting *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir.2007)). "Summary judgment is appropriate when the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Merriam v. Nat'l Union Fire Ins.*, 572 F.3d 579, 583 (8th Cir.2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## C. Iowa Tort of Bad Faith Denial of Insurance Benefits

 "Iowa law recognizes a common-law cause of action against an insurer for bad-faith denial or delay of insurance benefits," and this cause of action extends to workers' compensation cases. *Rodda v. Vermeer Mfg.*, 734 N.W.2d 480, 483 (Iowa 2007).[3] To establish a claim for bad faith denial of benefits, a plaintiff must prove " '(1) that the insurer had no reasonable basis for denying benefits under the policy, and (2) the insurer knew, or had reason to know, that its denial was without basis.' " *Id.* (quoting *McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 329 (Iowa 2002)); *see also Merriam*, 572 F.3d at 585; *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). "The first element is an objective one; the second element is subjective." *Bellville*, 702 N.W.2d at 473.

 Regarding the first element, a reasonable basis for denying benefits exists when a claim is "fairly debatable" as to either matters of fact or law. *Rodda*, 734 N.W.2d at 483; *see also Bellville*, 702 N.W.2d at 473. The focus of a bad-faith suit is not on whether the insurer's position was ultimately determined to be correct; instead, the focus is simply on whether a debatable issue as to coverage existed. *Bellville*, 702 N.W.2d at 473. "[I]f reasonable minds can differ on the

---

**3.** Because of the obligations the Iowa workers' compensation statutes and regulations place on the insurer, a bad faith action pursued by an employee, like Paulino, against the employer's insurance company is a "first-party" bad faith action under Iowa law. *McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 329 n. 2 (Iowa 2002).

coverage-determining facts or law, then the claim is fairly debatable." *Id.* In other words, a claim is "fairly debatable" if it is open to dispute on "any logical basis." *Id.; see also Rodda,* 734 N.W.2d at 483. The plaintiff in a bad faith action must do more than show the insurer's position was unreasonable; it is incumbent upon him to negate any reasonable basis for the insurer's position. *Bellville,* 702 N.W.2d at 481.

■■■■ Because the relevant question is whether evidence existed to justify the denial of a claim, the question of "[w]hether a claim is fairly debatable can generally be decided as a matter of law by the court." *Id.* at 473–74.[4] A negligent or sub-par investigation of a claim is relevant to the determination of whether a reasonable basis existed to deny the claim, but improper investigation on its own is insufficient cause for recovery if the insurer had an objectively reasonable basis for denying the claim. *Id.* at 474. With this background in mind, the Court first looks to the Iowa workers' compensation statute to determine whether Chartis was required to continue paying for Paulino to reside at CCS was "fairly debatable" as to either a matter of fact or of law.

### D. An Insurer's Duties Under the Iowa Workers' Compensation Law

■■■■ When an employee suffers an injury that is compensable under Iowa Code chapters 85 or 85A, Iowa Code § 85.27 mandates the employer "furnish *reasonable* surgical, medical, dental, osteopathic, chiropractic, podiatric, physical rehabilitation, nursing, ambulance and hospital services and supplies therefor and shall allow reasonably necessary transportation expenses incurred for such services." § 85.27(1) (emphasis added). An employer is also required to "furnish *reasonable and necessary* ... appliances." *Id.* (emphasis added). An appliance is defined as "hearing aids, corrective lenses, orthodontic devices, dentures, orthopedic braces, or *any other artificial device used to provide function* or for therapeutic purposes." Iowa Admin. Code r. 876–8.5(85) (emphasis added). "Reduced to its essentials, section 85.27 requires an insurer to furnish reasonable medical services and supplies *and* reasonable and necessary appliances to treat an injured employee." *Stone Container Corp. v. Castle,* 657 N.W.2d 485, 490 (Iowa 2003). The reasonableness of medical care or an appliance is a question of fact. *Manpower Temp. Servs. v. Sioson,* 529 N.W.2d 259, 264 (Iowa 1995). If the commissioner determines an expense is reasonable, on review, the district court must determine if that finding is supported by substantial evidence. *Quaker Oats Co. v. Ciha,* 552 N.W.2d 143, 154 (Iowa 1996).

■■■■ Under Iowa Code § 85.27, an employer is permitted to choose the care provided to an employee. *Long v. Roberts*

---

**4.** Situations in which the objective element would not be amenable to summary judgment would be those cases where the *reasons* supporting the insurer's denial are the subject of a genuine factual dispute. *Reedy v. White Consol. Indus., Inc.,* 890 F.Supp. 1417, 1439 (N.D.Iowa 1995). Chartis refused to authorize payment of Paulino's living expenses because it concluded Iowa law did not require it to do so. Paulino claims Chartis' reason for denying benefits was that Paulino was an illegal immigrant. However, Paulino has provided no evidence to support the assertion that Chartis denied Paulino benefits because of Paulino's immigration status; the evidence Paulino points to only indicates that Chartis was aware Paulino's immigration status made it more difficult to find suitable housing.

The other reason Paulino puts forth for the denial is that Chartis relied on the deputy commissioner's decision; however, that decision was made long after Chartis withdrew authorization for CCS and does not create a fact issue regrading Chartis' justification for refusing to continue to authorize Paulino's residence at CCS.

*Dairy Co.*, 528 N.W.2d 122, 123 (Iowa 1995). If an employee challenges the employer's choice of treatment and seeks alternate care, the employee bears the burden of proving the care chosen by the employer is unreasonable. *Pirelli–Armstrong Tire Co. v. Reynolds*, 562 N.W.2d 433, 436 (Iowa 1997). Neither party has provided the Court with a case holding, as a matter of law, that a particular expense requested as alternate care either is or is not compensable under § 85.27. The precedent from the Iowa Supreme Court indicates that the question of whether an employer is obligated to provide an employee with alternate care is intensely fact driven, as the cases described below demonstrate.

In *Manpower Temporary Services v. Sioson*, 529 N.W.2d 259, 264 (Iowa 1995), the court addressed the issue of whether a specially modified van was a "medical necessity" for which the employer was liable. *Sioson*, 529 N.W.2d at 261. The employee in *Sioson* was a quadriplegic who had been supplied with a 300–pound wheelchair. *Id.* The wheelchair could not practically be transported by car, and public transportation was limited. *Id.* The employee was "a single person who did not own or desire a motor vehicle before being injured, then preferring walking or traveling by bicycle, or by public transportation." *Id.* at 262. The court found this was an "extremely rare" factual situation where a "modified van constituted medical care, appliance or transportation as contemplated by the statute." *Id.* at 264. In particular, the court cited the employee's family status and the fact that her "past lifestyle reveal[ed] no other use for the van." *Id.* The court concluded that an appliance was a "means to an end," and the van was necessary to make the wheelchair "fully useful" and restore the employee's movement to the fullest extent possible. *Id.* Accordingly, the court held that the commissioner did not err in concluding the van

was an appliance that was reasonably necessary for the employee's care. *Id.*

The court also affirmed the district court's determination that the van's "repair, fuel, title, license and insurance" were not reasonable medical expense and should therefore be borne by the employee. *Id.* The court based this conclusion on the fact that the extent of these purchases was within the control of the employee based upon her own choices regarding the van's use. *Id.* Because these choices were not "matters of medical necessity," they were the employee's responsibility as opposed to the employer's. *Id.*

The next year, the Iowa Supreme Court decided *Quaker Oats Co. v. Ciha*, 552 N.W.2d 143 (Iowa 1996). In *Ciha*, as in *Sioson*, the employee was rendered a quadriplegic. *Id.* at 147. A driving specialist recommended Ciha purchase a specially modified van in order to be able to drive independently. *Id.* at 148. Ciha purchased and modified the van and also made modifications to his home to accommodate his disability. *Id.* at 148. "The home modifications included widened doorways, a ramp into the home, a special shower, an elevator, and other items necessitated by Ciha's wheelchair-bound status." *Id.* at 154. His employer denied the expenses were compensable under § 85.27. *Id.* at 148. The deputy commissioner concluded that van modification and home modification were compensable and the commissioner and district court affirmed this award. *Id.* at 149. On appeal, the employer challenged, among other things, the award of costs for the home modification and van conversion. *Id.* at 154. The court, again citing the unique facts of the case, concluded that the "home modifications and van conversion are merely an extension of Ciha's wheelchair." *Id.* at 156. In affirming the award, the court noted that, unlike in *Sioson*, Ciha had not

been awarded the purchase price of a van but instead had only been awarded the modification costs. *Id.*

The court again addressed the precise contours of § 85.27 in *Stone Container Corp. v. Castle*, 657 N.W.2d 485 (Iowa 2003). In that case, the employee "suffered catastrophic injuries in an industrial accident." *Id.* at 487. As a result of these injuries, the employee lost both his legs as well as his buttocks, rectum, and a testicle. *Id.* Due to extensive skin grafts and scarring, the employee was forced to spend most of his time in his room where the temperature could be controlled to help control his intense pain. *Id.* at 487–88. His skin problems also meant that he could not use a normal wheelchair and was instead required to use a "prone cart." *Id.* at 488. The employee requested a laptop computer and corresponding adaptations that would allow him to use the computer with his wheelchair and prone cart. *Id.* The employer argued a computer was not "medical care" and therefore was not required under § 85.27. *Id.* Specifically, the employer argued that a computer was not "reasonable and necessary medical or surgical care" and that it did not "improve function." *Id.* at 490. The deputy commissioner disagreed, and the Iowa district court affirmed on appeal. Although the Iowa Court of Appeals reversed, the Iowa Supreme Court granted the petition for review, vacated the Iowa Court of Appeals opinion, and affirmed the district court's judgment upholding the commissioner's decision.

In *Castle*, the Iowa Supreme Court addressed what constituted an "appliance" under § 85.27 by once again noting the "peculiar facts" of the case. *Id.* at 491. After reviewing *Sioson* and *Ciha*, the court summarized the cases by noting that they "stand, in part, for the principle that an expense falls within the scope of § 85.27 if it covers the cost of a device that replaces a function lost by the employee as a result of the employee's work-related injury." *Id.* at 491–92. The court rejected the idea "that an appliance must be necessary for *medical* care" or for physical mobility. *Id.* at 492. Under § 85.27, it is "the end function that is important; an appliance, whatever its form, is simply a means to get there." *Id.* In *Castle's* case, the end function was interaction with the outside world. *Id.* The computer was a necessary means to that end and was therefore an appliance under § 85.27. *Id.*

 Taken together, these cases reveal a few common threads. First, when an employee requests an insurer cover expenses that are not explicitly listed in § 85.27 and are not medically necessary, the question of whether an employer is responsible for the expense is driven by the facts of the case. As noted above, the *Sioson*, *Ciha*, and *Castle* courts all emphasized the unique and peculiar facts of the particular case, and in each case the award of nonmedical expenses was upheld but only after the court noted the extreme facts of the case. Second, expenses that were made necessary by the injury are compensable, whereas expenses the employee bore before the injury may not be. For example, the employee in *Sioson* was awarded the cost of a modified van in part because prior to her injury, her lifestyle did not require a vehicle at all because she rode a bicycle or took public transportation, and those options were not available after her injury. *Sioson*, 529 N.W.2d at 264. Conversely, the employee in *Ciha*, who owned a vehicle prior to his injury, was only awarded the cost of the modifications to a van, as opposed to the purchase price of the van itself. *Ciha*, 552 N.W.2d at 156. There is also a distinction between the cost of the appliance and costs that are in the discretion and control of the employee. *See Sioson*, 529 N.W.2d at 264 (noting

repairs, fuel, title, license, and insurance costs would depend on the extent to which the employee used the van and were not issues of medical necessity and could therefore be the responsibility of the employee). Finally, when seeking to determine whether an expense is covered by § 85.27, one should consider the "end function" of the artificial device and whether that end function has been denied by the employee's injury and can only be restored through the appliance. *Castle*, 657 N.W.2d at 492.

With these principles in mind, this Court must determine whether Chartis' withdrawal of authorization for Paulino's continued residence at CCS constitutes bad faith.

### E. Paulino's Bad Faith Claim

In order for Paulino to prevail on his claim that Chartis acted in bad faith when it discontinued authorization of his expenses at CCS, Paulino must prove Chartis had no reasonable basis to deny his expenses at CCS and that Chartis knew or had reason to know that its refusal to pay those expenses was without basis. *Bellville*, 702 N.W.2d at 473. For summary judgment to be granted, Chartis must show that viewing the facts in the light most favorable to Paulino, Paulino has failed to establish at least one of the two

required elements. *Merriam*, 572 F.3d at 583. The first element—whether Chartis had a reasonable basis to deny the claim—is objective and requires the Court to determine whether the claim is "fairly debatable." *Id.* This element "can generally be decided as a matter of law by the court." *Bellville*, 702 N.W.2d at 473.

As a matter of law, an insurer's position is "fairly debatable" if reasonable minds can differ on the coverage—determining facts or law. *Id.; see also Rodda*, 734 N.W.2d at 483. Under § 85.27, the question of whether an employer is responsible for benefits hinges on whether those benefits are reasonable and necessary.[5] Whether a particular treatment or appliance is reasonable and necessary is a question of fact. *Sioson*, 529 N.W.2d at 263. The focus of cases such as *Sioson*, *Ciha*, and *Castle* was whether, under the facts of the case, the particular appliance was reasonable and necessary in light of the employee's unique situation. As in those cases, the underlying dispute in Paulino's case was a factual one: whether it was reasonable and necessary for Chartis to pay for Paulino's residence at CCS based on the unique circumstances of his case. Even though the underlying dispute was factual, the dispute over whether Chartis' position in that dispute was objectively reasonable is a question of law in a

---

**5.** Paulino makes note of the fact that the commissioner determined that Chartis acted unreasonably and claims that the commissioner's decision "summarizes why no trier of fact could determine that Chartis acted reasonably in this case." Pl. Br. 14, ECF No. 12–2. This statement overemphasizes the commissioner's findings. While the Commissioner did conclude that it was not reasonable for Chartis to deny Paulino living expenses at CCS, the Commissioner's decision did not state that no trier of fact could conclude otherwise. In fact, the commissioner emphasized the unique nature of Paulino's case before concluding it would be unreasonable to deny living expenses.

Paulino also argues that once the commissioner reversed the deputy commissioner's decision on July 17, 2008, Chartis no longer had a reasonable basis to deny Paulino's benefits. There are several problems with this position. First, Paulino alleges the denial occurred on May 6, 2006. Second, the only action taken to "deny" authorization after July 18, 2008, was to petition for judicial review of the commissioner's decision. It would be a seemingly rare occasion when the exercise of an appellate right, without more, could be a bad faith denial of benefits.

subsequent bad faith proceeding. *Rodda,* 734 N.W.2d at 483.

Before determining whether Chartis had an objectively reasonable basis to withdraw authorization for Paulino's continued residence at CCS, it is necessary to clarify exactly for which expenses Chartis did and did not withdraw authorization. Chartis claims it withdrew authorization for Paulino's living expenses but that it continued to cover Paulino's medical expenses. Paulino claims there is a genuine factual dispute over whether Chartis denied more than "living expenses" when it refused to continue to authorize payments to CCS and that this dispute is material, thereby precluding summary judgment. To support this claim, Paulino cites the testimony of Ruth Fox, a nurse at CCS who testified in a deposition in connection with Paulino's workers' compensation claim that as of March 12, 2007, Paulino was still receiving a "life skills therapist, case management, medical nursing, transportation and crisis intervention ... as needed" at CCS. Ruth Fox Dep. 3, 20, Pl.App. 34, 38, ECF No. 12–3. Paulino's Petition alleges that "[o]n May 6, 2006, Defendant terminated payment of Plaintiff's medical treatment, care, and services at CCS." Pet. ¶ 43, Def.App. 8, ECF No. 11–3. Chartis admitted this allegation in its Answer.

In an interrogatory and in its Reply to Plaintiff's Statement of Additional Material Facts, Chartis qualified this statement and asserted that it only withdrew authorization and denied payment for Paulino's living expenses, as opposed to his medical expenses. In support of its position, Chartis points to physical and occupational therapy discharge reports indicating that Paulino was ready to be discharged prior to May of 2006, as well as the fee agreement between Chartis and CCS, which indicated that CCS's fee did not include physician services, medications, medical equipment, medical supplies, lab work, X-rays, other medical services and physician consultations, as well as personal hygiene items and leisure activities. Chartis claims this evidence demonstrates that Paulino's medical care was independent of his living expenses at CCS.

The decisions in the underlying workers' compensation claim also indicate that the dispute involved living expenses at CCS as opposed to medical expenses. Deputy Commissioner Rasey, Commissioner Godfrey, and Judge Gamble each noted that the dispute in the underlying workers' compensation action was over whether Paulino's living expenses were compensable under § 85.27. Commissioner Godfrey stated that "[t]he issue of contention in this case is whether [Paulino]'s continued stay at CCS is medically necessary in that defendants would be required to pay nonmedical living expenses. According to CCS, although there are occasional problems, [Chartis] is continuing to provide his medicine and medical treatment services." Appeal Decision 3, Def.App. 29, ECF No. 11–3. The commissioner's order discussed how living expenses "are usually not compensable medical expenses" following an injury. Appeal Decision 8, Def.App. 34, ECF No. 11–3. On judicial review, Judge Gamble found that Chartis "continue[d] to state that it intended to continue paying for Paulino's medical expenses and for modification of Paulino's new residence." Order on Judicial Rev. 6. Def.App. 41, ECF No. 11–3.

An objective review of the record reveals there is no material factual dispute over the fact that while Chartis refused to pay for Paulino's living expenses at CCS, it nevertheless continued to pay his medical expenses and was willing to pay for modifications to Paulino's residence once one was located. The only evidence Paulino has produced in an effort to create a factual dispute on this issue is Fox's testimony

regarding the services Paulino received while he continued to reside at CCS. While Fox's testimony establishes what care Paulino was receiving at CCS, it does not indicate whether Chartis was paying for those services after May 6, 2006. Each of the decisions in the underlying workers' compensation case clearly states that the disputed issue was whether Chartis was required to pay for Paulino's living expenses. Paulino has failed to generate a material factual dispute on this issue.

This Court notes that Paulino also misstates the nature of the evidence needed to successfully resist Chartis' Motion for Summary Judgment. Paulino claims that "despite Chartis' argument, there is a genuine issue of material fact that Chartis denied compensable benefits under Iowa Code section 85.27" and that he "has demonstrated sufficient evidence that there exists a genuine issue of material fact that Defendant Chartis denied payment of [Paulino]'s Section 85.27 benefits at CCS after May 6, 2006." Pl. Br. 7–8, ECF No. 12–2. Producing evidence that a jury could find Chartis denied compensable benefits to Paulino will not defeat Chartis' motion for summary judgment. The commissioner and the Iowa district court have already determined *under the unique facts of this case* that Chartis did in fact deny Paulino benefits to which he was entitled under Iowa Code § 85.27. The issue in this case is whether Chartis had a reasonable basis for doing so. *See Bellville,* 702 N.W.2d at 473. Accordingly, it is not enough for Paulino to simply show that a reasonable jury could have found he was entitled to benefits. Paulino needs to show that his entitlement to living expenses at CCS was not fairly debatable under Iowa law. This Court now turns to that question.

■■■■ This case bears several hallmarks of a "fairly debatable" issue. The deputy commissioner agreed with Chartis'

determination that Paulino's residence at CCS was not compensable under § 85.27. This initial conclusion is important because "if an impartial judicial officer informed by adversarial presentation has agreed with the insurer's position, it is hard to argue that the insurer could not reasonably have thought that position viable." *Rodda,* 734 N.W.2d at 485 (citation and internal quotation marks omitted). After all, "[t]he focus is on the existence of a debatable issue, not on which party was correct." *Bellville,* 702 N.W.2d at 473. Deputy Commissioner Rasey noted that CCS' rate included "such nonmedical expenses as food, rent, utilities and cable television." Dep. Comm'r Arb. Dec. 8, Def.App. 25, ECF No. 11–3. The deputy commissioner, relying on *Sioson,* determined that, like the license, title, fuel, and repairs of the van in that case, those types of services provided by CCS were not medical necessities. Ultimately, the deputy commissioner's decision was reversed by the commissioner, and that reversal was affirmed by Judge Gamble. Paulino claims that because the deputy commissioner's ruling was overturned by the commissioner, it cannot be used as evidence that the issue of whether Chartis' responsibility for Paulino's residence at CCS was "fairly debatable." This assertion is inaccurate, directly colliding with established precedent. The deputy commissioner's decision is not being used to show that Chartis was ultimately correct, only that an impartial judicial officer agreed with Chartis' position, which, as noted above, is strong evidence of a debatable issue. *See Rodda,* 734 N.W.2d at 485.

■■■ There was substantial dispute over whether the facts of this case made it necessary and reasonable for Paulino to remain at CCS as opposed to forcing him to find some other form of housing that he would have to pay for. "'[U]nless the insured is entitled to a directed verdict in

his favor on the policy claim'" the insurer should be entitled to judgment on a bad faith claim as a matter of law. *Bellville*, 702 N.W.2d at 474 (quoting Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5–17 to 5–18 (2d ed.1997) (stating an insurer is entitled to a directed verdict on the bad faith claim unless the insured is entitled to a directed verdict on the policy claim)). The present case, as noted above, was factually contested at the administrative and state district court levels. The state district court referenced the credibility disputes between various physicians and care givers that needed to be resolved in order to determine whether continued residence at CCS was reasonable and necessary. Paulino himself acknowledges there was a genuine issue of material fact as to whether Chartis denied him compensable benefits. The presence of a factual dispute requiring a credibility determination indicates that there was some evidence to support Chartis' position, and therefore the issue was fairly debatable.

Precedent concerning reasonably necessary medical expenses and appliances owed to employees in situations similar to Paulino paints a less than clear picture of exactly what expenses are the employer's responsibility. Both parties point out in their briefs that prior to this dispute, Iowa precedent did not provide a definitive answer to the question of whether an employer could be responsible for an injured employee's living expenses. *See* Def. Br. 6, ECF No. 11–1 ("There is no controlling agency law, case law, statute, or administrative rule that requires an employer or its insurer to pay for an injured worker's underlying living expenses."); Pl. Br. 9, ECF No. 12–2 ("[A]t the time Chartis terminated [Paulino]'s benefits at CCS there was no controlling agency law, case law, statute, or administrative rule that expressly excused an employer or its insurer to pay for services and appliances

provided by a facility caring for a paraplegic"). The lack of any express rule in such situations means that there is an inherent uncertainty as to what Chartis was responsible for providing Paulino. This uncertainty indicates Chartis' initial refusal to pay Paulino's living expenses was not unreasonable.

Commissioner Godfrey and Judge Gamble both noted that living expenses, such as those provided by CCS, are generally not the responsibility of an employer; they were only Chartis' responsibility in this situation due to Paulino's unique set of circumstances. One of the unique features in this case was Paulino's status as an undocumented worker. This fact was noted at the administrative and state district court levels. Paulino claims the deputy commissioner and Chartis used Paulino's immigration status to justify denying him benefits. There is no indication of this in the record. Paulino's immigration status was mentioned only to explain why he had particular difficulty in obtaining other public support and in finding housing that he could afford that could be adapted by Chartis to his needs. Paulino's assertions that his immigration status was the basis for his being denied authorization to remain at CCS appear to be unsupported by the evidence even when all legitimate inferences are drawn in Paulino's favor.

Chartis complied with the express mandates of the statutes and prior precedent. Chartis did not deny responsibility for any clearly medical expenses owed to Paulino. As required by *Ciha*, Chartis agreed it was responsible for modifying whatever home Paulino eventually found to accommodate a wheelchair and for making other modifications to accommodate his injuries. *Sioson* also fails to provide a definitive answer to the question posed by Paulino's contested case before the commissioner. Under the rationale advanced in *Sioson*, Chartis

would only be responsible for furnishing devices that were made necessary as a result of Paulino's injury. *See Sioson,* 529 N.W.2d at 262 (noting the employer was responsible for providing a van based, in part, on the fact that prior to her injury, the employee did not need or want a van). Paulino would have needed a place to live prior to his injury; his injury did not cause him to need a place to live or sustenance, it only meant that his place of residence would need to be modified, and Chartis was willing to make those modifications. In the absence of any prior court ruling rejecting such an argument, this was an objectively reasonable position for Chartis to have taken prior to an ultimate judicial determination to the contrary.

*Castle* also fails to provide any explicit mandates in Paulino's situation. Paulino insisted that Chartis was responsible for providing Paulino with a permanent place to live. *Castle* states that a device that replaces a function lost by the employee as a result of the employee's work-related injury is compensable. *Castle,* 657 N.W.2d at 491–92. Under the facts of that case, an appliance need not be necessary for medical care or restore physical mobility to an injured employee to be compensable under § 85.27. *Id.* at 492. Instead, the relevant inquiry is what "end function" the employee lost and whether the requested appliance is a "viable and necessary means" to restore the end function. *Id.* Ultimately, the district court affirmed treating Paulino's end function as "his livelihood, his survival" and determined his living expenses were a necessary and viable means to this end. Order on Judicial Rev. 19, Def.App. 54, ECF No. 11–3. This is a reasonable, though broad, interpretation of the doctrine set forth in *Castle.* However, it is not the only interpretation *Castle* could be given. Given the malleable and fact-driven analysis set forth in *Castle* and other related precedent, predicting the

resolution of Paulino's claim was anything but certain.

Paulino believed staying at CCS was necessary and reasonable; Chartis did not. Chartis made this decision based on Paulino's doctors' conclusions that it was no longer necessary for Paulino to remain at CCS and that he could move into his own residence, provided it were modified and Paulino were provided with various other services, which Chartis agreed to provide. The medical personnel involved agreed that Paulino did not have to stay at CCS, but they also agreed he must be discharged into a suitable environment. The disagreement was over the consequence of Paulino's being, practically speaking, unable to leave CCS, but not needing to stay there and, as a result, who must continue to pay for Paulino's stay at CCS. In light of the uniqueness of the situation and the lack of clear guidance from Iowa statutes, regulations, and precedent, it was objectively reasonable for Chartis to conclude it was no longer responsible for Paulino's living expenses and, accordingly, to withdraw authorization for Paulino's continued residence at CCS. Chartis cannot be liable for bad faith, and summary judgment is appropriate.

Paulino's injuries are tragic, and his personal situation compounded that tragedy. He, his doctors, and his employer's insurance company were faced with a unique situation in which Paulino was medically able to begin living independently but circumstantially unable to do so. The commissioner and the state district court acknowledged that it is generally not the responsibility of an employer to provided an injured employee with living expenses, but this case presented a special situation where such an outcome was deemed warranted. In such a unique situation, this Court determines that Chartis acted in an objectively reasonable manner when it

withdrew authorization for Paulino's continued residence at CCS.

## III. CONCLUSION

For the foregoing reasons, Chartis' Motion for Summary Judgment, ECF No. 11, must be **granted.** The above-captioned case is **dismissed.**

**IT IS SO ORDERED.**